## Lester LANCASTER *v.* THE DAILY BANNER-NEWS PUBLISHING CO., INC.

81-96                                    622 S.W. 2d 671

Supreme Court of Arkansas
Opinion delivered October 26, 1981

146

*Anderson, Crumpler & Bell, P.A.,* for appellant.

*Woodward, Kinard & Epley, Ltd.,* and *Vincent Foster, Jr.* of *Rose Law Firm,* for appellee.

DARRELL HICKMAN, Justice. This is a defamation case. Lester Lancaster, a policeman for the City of Magnolia, Arkansas, sued the local newspaper, The Daily Banner-News, alleging that he was defamed in a series of editorials the paper ran in 1975. The newspaper filed a motion for summary judgment with affidavits setting forth the actual knowledge the writers had when the editorials were written. Lancaster countered with his affidavit, and numerous, lengthy depositions, mostly of people the writers for the Banner-News had named as their sources. The trial court granted summary judgment finding that no substantial evidence of actual malice existed.

Lancaster appeals alleging two errors: The court was wrong in granting summary judgment and wrong in denying Lancaster's motion to require the newspaper to answer certain allegations. We affirm the judgment.

Lancaster concedes that he is a "public official," the editorials were about his official conduct, and the issue is reduced to one of actual malice. Since he is a public official, he is less protected in a defamation case than a private citizen. *Time, Inc.* v. *Firestone,* 424 U.S. 448 (1976).

The rule all courts must follow in a defamation case involving a public official was announced in *New York Times Co.* v. *Sullivan,* 376 U.S. 254 (1964). Sullivan was one of three city commissioners of Montgomery, Alabama; the publication was a full page advertisement. The Court found that the first amendment to the United States Constitution "prohibit[s] a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he preoves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co.* v. *Sullivan, supra,* at pp. 279, 280.

The Supreme Court has set some boundaries of what "actual malice" is and what it is not. Actual malice means that " . . . the utterance was false and that it was made with knowledge of its falsity or in reckless disregard of whether it was false or true." It would be a " . . . lie, knowingly and

deliberately published about a public official . . . " *Garrison* v. *Louisiana,* 379 U.S. 64 (1964).

It is not material that the speaker has a personal motive. In *Garrison* v. *Louisiana, supra,* the Court said: "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred; even if he did speak out of hatred, utterances honestly believed contribute to the free interchange of ideas and the ascertainment of the truth."

Actual malice is more than a negligent act. In *St. Amant* v. *Thompson,* 390 U.S. 727 (1968), a political candidate read on television an affidavit containing certain defamatory accusations against a deputy sheriff. The Court held that since the defendant relied on an affidavit, even though he could have and did not investigate the charges himself, there was no actual malice. The Court declared: "[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. . . Failure to investigate does not in itself establish bad faith." At 731, 733.

In *Beckley Newspapers Corp.* v. *Hanks,* 389 U.S. 81 (1967), a newspaper published an editorial criticizing an elected official. The newspaper admitted that it did not investigate the charges. The Court reversed the lower court's judgment for the official, ruling that failure to investigate did not amount to the high degree of awareness of probable falsity demanded by *New York Times Co.* v. *Sullivan, supra.*

The federal rule requiring actual malice is based on the premise that freedom of expression must enjoy some legal privilege from fear of punishment for misstatements about public officials. Quoting, with approval, from a previous concurring opinion by Justice Brennan, the Court in *Sullivan* said:

Those who won our independence believed . . .that public discussion is a political duty; and that this

should be a fundamental principle of the American government. They recognized the risks to which all human institutions are subject. But they knew that order cannot be secured merely through fear of punishment for its infracton; that it is hazardous to discourage thought, hope and imagination; that fear breeds repression; that repression breeds hate; that hate menaces stable government; . . .

The Court described the atmosphere that must be allowed to exist if free speech is to be a meaningful constitutional guarantee: The " . . . debate on public issues should be uninhibited, robust, and wide-open, and . . . it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." Free debate must be protected if the freedom of expression is to have the "breathing space that [it] needs . . . to survive." *New York Times Co.* v. *Sullivan, supra,* at 721.

With these principles in mind we examine the facts in this case.

The editorials, a series of eleven, were about the state of law enforcement in the City of Magnolia, Arkansas. Lancaster was no doubt specifically attacked for his conduct as a policeman. The first editorial, dated April 16, 1975, was run after a trial in municipal court during which a local citizen, Walter Crabtree, testified that Lancaster and another policeman had beaten and abused him. The municipal court found Crabtree guilty of resisting arrest and using profane and abusive language; he was found not guilty of assault and battery and public drunkenness. This editorial generally related the testimony given at the trial, giving credit to conflicting stories of Crabtree and the two officers. it stated, "It was established, however, that Crabtree was struck at least once by a blackjack by Lancaster in the Police Chief's private office and knocked to his knees . . . the situation got completely out of hand . . . with Crabtree, who weighs about 145 . . . pounds — being blackjacked, allegedly being hit in the mouth by McKinnis . . . while handcuffed."

A follow-up editorial was published April the 22nd and

related a separate incident of violence. It said a Magnolia businessman had seen a Magnolia City patrolman strike a youth; the editorial related that according to the report the blow was not justified. No mention was made of who the policeman was. It stated that the Mayor had talked to the two police officers involved and that they denied striking the youth.

On July 10, 1975, an editorial summarized the previous editorials about Lancaster and the city government's action. it concluded:

What is going on in our police department?

Reports and rumors have been circulating for some time now about brutality, vindictive actions, intimidations, violations of individual constitutional rights, inefficiency, lack of continuing in-service training, illegal searches of both autos and homes, botched up investigations and arrests, lack of adequate supervision and direction on the top level, among other things.

Then finally on September 22, 1975, an editorial specifically directed toward Lancaster was published. It is the main basis of Lancaster's action and in relevant part it reads:

Magnolia's controversial city policeman, Lester Lancaster, continues to flaunt the constitutional rights of individual citizens in his self-styled goal to clean up the city of Magnolia.

Already under investigation by the U.S. Justice Department when he and another policeman allegedly beat up a Magnolia man in the private office of Police Chief James Cleaver in an accident that was highly questionable from the beginning to the disastrous end. Lancaster evidently believes he has the power (not the right, but the power) to violate the constitutional rights of any person as he so chooses.

Reports of illegal arrests, illegal searches, brutality, intimidation, among other things, regarding Lancaster have been made not by one Magnolia citizen but by several.

Lancaster evidently believes he has unlimited authority to pursue whatever matter he wishes in Magnolia and even out of the city, which he has done illegally on several occasions.

R. W. Chowning, the general manager of the Banner-News, and Steve Ford, the managing editor, wrote the editorials. It was undisputed that they attended the municipal court trial and that the first editorial followed that trial. It is not specifically pointed out where the editorial was false, rather it is argued that the paper slanted the editorial by ignoring the court's findings that the "victim" was indeed found guilty of two crimes.

Ford's affidavit and deposition reflected that he was told by Lynn Keith, a local Magnolia businessman, about the incident referred to in the April 22nd editorial concerning a youth being struck by Lancaster. There is no evidence that Ford misrepresented what he was told.

The editorials, including the final one, were justified on the basis of numerous conversations with local citizens, officials, named and unnamed, and an accumulation of sources. In all, Ford and Chowning listed no less than thirteen people as named sources, in addition to personally attending the trial. For example, a local attorney, Joe Woodward, related to Chowning that Lancaster had been on his farm, ten miles outside the city limits, "staking out" a building. According to Woodward, Lancaster said he was there because he had found a stolen wheelbarrow nearby; Lancaster said he had gained entrance to the building and checked the cracks in the floor for evidence. Lancaster did not explain to Woodward by what authority he was on the place or gained entrance to the private structure. An alderman related an instance where Lancaster was involved in a road block outside the Magnolia city limits, which to his knowledge was illegal.

The city attorney, in his deposition, conceded that "over coffee" he had talked about at least two cases in which charges were dismissed because of searches conducted by Lancaster that were not proper. He conceded that Ford was present but disputed the imputation Ford had given to his remarks.

Several people told the writers about instances of young people's vehicles being searched without consent or without otherwise being "legal."

It is not pointed out exactly where the editorials were factually incorrect and the newspaper concedes no factual errors. Instead Lancaster argues about the accuracy of the stories told to the writers, whether their written observations were accurate reflections, and whether the proper conclusions were drawn. He claimed that he had never beaten anyone or violated any rights. Actually it is irrelevant whether the articles were factually correct. The issue was and is, did Lancaster prove the writers knowingly printed false defamatory statements, maliciously so, in total disregard of the truth. Decidedly no, when the *Sullivan* test is applied.

Besides denying he ever violated anyone's rights, Lancaster in his affidavit also zeroed in on what he perceived to be the cause of the editorials: Chowning's longstanding desire to get him fired.

Lancaster had arrested Chowning's son for possession of marijuana in 1970. The charges were dropped by the prosecuting attorney because, as he still remembered in 1978, there was an evidentiary problem connected with the arrest. Lancaster arrested Chowning's son again in 1972 for possession of marijuana; the son pleaded guilty and was placed on probation. He was again arrested in April, 1974, by Lancaster on the same charge. It had not been disposed of at the time of this trial. There is no doubt that Chowning did not care for Lancaster and blamed him for some of his son's problems. Both the Mayor of Magnolia and the Chief of Police stated that Chowning came to them at one time and demanded that Lancaster be fired. Both of them said that Chowning told them that the drug and liquor laws should

be relaxed or simply not enforced. A former employee of the newspaper testified that she knew Chowning wanted Lancaster fired. Chowning never conceded that he made the statements that the Mayor and the Chief of Police attributed to him but he did not deny that he had indicated to others that Lancaster was not "temperamentally suited to be a policeman."

Lancaster's main argument to the trial court and to this court is that the reason for the editorials was Chowning's grudge against him, and that amounted to actual malice. Actual malice is a term of art. *Cantrell* v. *Forrest City Publishing Co.,* 419 U.S. 245 (1974). Its definition is found by studying relevant decisions. In the case of *New York Times Co.* v. *Sullivan, supra,* it was demonstrated that the New York Times did not even check its own files to determine whether a statement was true. As it turned out it was false. That was not actual malice. In *St. Amant* v. *Thompson, supra,* a political candidate made charges against a deputy sheriff without investigating the source of his information. That was not actual malice.

In the case of *Garrison* v. *State of Louisiana, supra,* the Court considered a Louisiana statute which punished false statements made with "ill will." The statute was overruled because ill will is irrelevant when the constitutional standards are applied to such a publication. It is immaterial that the writer is biased against the official, has ill will towards him, or intended to inflict harm upon him. *Garrison* v. *Louisiana, supra; Rosenblatt* v. *Baer,* 383 U.S. 75 (1966). The test is not one of ordinary care or mere negligence or intention but reckless disregard for the truth. *New York Times Co.* v. *Sullivan, supra.*

The other argument relates to certain interrogatories which the newspaper declined to answer. The trial court upheld the newspaper's objections. One was a request for the identity of the stockholders of the newspaper. Another asked for any changes in stock ownership since the last stockholders meeting before April 25, 1975. The trial court properly ruled that the newspaper did not have to answer these interrogatories. The reason given for the request was

154

that potential jurors might be biased or prejudiced because they were stockholders. Obviously such prospective jurors would be weeded out during the voir dire process. The subject was not one for discovery at this stage of the lawsuit.

The other request was whether the writer had knowledge of other law enforcement officials in Columbia County, Arkansas, other than Lancaster who had reputedly struck a citizen. This information sought to prove that Chowning had bad faith in writing the editorials and was engaged in a personal vendetta against Lancaster. The trial court ruled it irrelevant and we agree for the reasons we have stated.

Affirmed.

HOLT, J., not participating.