THOMAS FOGUS, Plaintiff-Appellant, *v.* CAPITAL CITIES MEDIA, INC., *et al.,* Defendants-Appellees.

Fifth District No. 81—570

Opinion filed December 20, 1982.—Rehearing denied January 18, 1983.

Amiel Cueto, of Belleville, for appellant.

Robert B. Hoemeke and John M. Hessel, both of Lewis, Rice, Tucker, Allen and Chubb, of St. Louis, Missouri, for appellees.

JUSTICE WELCH delivered the opinion of the court:

Plaintiff, a Belleville, Illinois, police officer, brought suit in the Circuit Court of St. Clair County to recover damages for the publication of an alleged libel. The defendants are Capital Cities Media, Inc., publisher of the *Belleville News Democrat*, and Joseph Weiler, an editor of that newspaper. The trial court sustained a motion to dismiss the complaint and entered judgment for the defendants. Plaintiff has appealed.

On August 20, 1979, a news story appeared in the *Belleville News Democrat* with the headline: "Youths arrested in raid say police abused them." The article is reprinted in full in Appendix A. According to the article, five unnamed youths, who had been among 25 persons arrested in a drug raid, told the newspaper in separate interviews that the plaintiff repeatedly threatened to "bust their \*\*\* teeth out," that he hit at least one youth with a nightstick, and that he refused to allow them to use the bathroom after they arrived at the jail. The chief of police was quoted as denying the charges of physical abuse, saying "That's a goddam lie. No one was roughed up." In addition, three paragraphs were given to the plaintiff's explanation of what transpired:

"Fogus denied all the charges. 'Don't ask the kids. Do you think we had 33 happy people back there? There was no police brutality. If they had any gripes they had the mayor and chief of police there to complain to.'

'You fellows always want to believe the kids. Ask the police, they were there.'

He said it was impossible to allow the youths to use bathroom facilities because of the number involved."

On April 29, 1981, the plaintiff filed his first amended complaint alleging that the charges of threats and physical abuse were false and that the defendants either knew they were false or printed the statements in reckless disregard of whether they were true or false.

The plaintiff's first amended complaint contained four counts. Count I charged that the defendant corporation printed false statements about the plaintiff deliberately or with reckless disregard of the truth. Count III made the same charge against editor Joseph Weiler. Counts II and IV stated that the defendants acted in retaliation for the previous arrest on drug charges of Larry Gauthier, defendants' former employee, and/or retaliation for the raid which was directed against drug traffic in Belleville.

The defendants filed a motion to dismiss plaintiff's first amended complaint on May 22, 1981. The defendants argued in their motion, *inter alia,* that the publication of the article was constitutionally priv-

ileged by the first and fourteenth amendments and that the plaintiff's first amended complaint failed to allege facts to support a claim for damages in light of the constitutional protections of the first and fourteenth amendments. In an order entered on July 24, the court granted the defendants' motion to dismiss, holding that the plaintiff's complaint failed to state a cause of action.

■ Plaintiff contends on appeal that the statements in the news story are libelous *per se* since the article falsely imputes the commission of a criminal offense. (*Colson v. Stieg* (1980), 86 Ill. App. 3d 993, 408 N.E.2d 431, *aff'd* (1982), 89 Ill. 2d 205, 433 N.E.2d 246.) To constitute libel *per se* an article need not state the commission of a crime in terms of art or with the particularity of an indictment. (*Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 395 N.E.2d 1185.) In the case at bar, the news story stated that the plaintiff physically abused youths arrested by him during a drug raid. At the least, these statements suggest that the plaintiff committed battery, a crime under the Illinois Criminal Code of 1961 (Ill. Rev. Stat. 1981, ch. 38, par. 12—3). Moreover, the defendants suggest no plausible innocent construction of their statements (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344; *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 419 N.E.2d 350), and have not responded in their brief to the plaintiff's argument that allegations of criminal conduct are libel *per se.*

■ Instead, the defendants assert the libel action was properly dismissed for failure to state a cause of action because the news story was constitutionally protected by the doctrine of "neutral reportage." The doctrine of neutral reportage first arose in *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113. (See *Cianci v. New Times Publishing Co.* (2d Cir. 1980), 639 F.2d 54, 67-71.) In *Edwards,* the *New York Times* reported that an official of the National Audubon Society had referred to five eminent scientists as "paid liars" because they had disputed the reported harmful effects of the chemical DDT on wildlife. Three of the scientists brought suit against the newspaper and the society, and following a jury trial, the district court rendered judgment for the plaintiffs.

The United States Court of Appeals for the Second Circuit held that the article was protected by the first amendment for two reasons. First, accurate and disinterested reporting of defamatory statements about a public figure by responsible and prominent organizations are protected regardless of the reporter's private views on the validity of the charges. In the alternative, the second circuit held that the plaintiffs had not shown either that the newspaper knew the statements were false or that it had entertained serious doubts about

their truthfulness. The second circuit noted that there was not "a shred of evidence from which the jury might have found" that the defendants had entertained serious doubts about the charges, which turned out to be baseless. *Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113, 120.

The districts of the Illinois Appellate Court are split concerning the constitutional validity of the neutral reportage doctrine. The first district has consistently rejected the doctrine (*Tunney v. American Broadcasting Co.* (1982), 109 Ill. App. 3d 769, 441 N.E.2d 86; *Newell v. Field Enterprises, Inc.* (1980), 91 Ill. App. 3d 735, 415 N.E.2d 434; See also *Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 395 N.E.2d 1185 (Romiti, J., dissenting)), while the fourth district has approved of the doctrine (*Krauss v. Champaign News Gazette, Inc.* (1978), 59 Ill. App. 3d 745, 375 N.E.2d 1362). The Illinois Supreme Court has expressly refused to address the issue. *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 170, 419 N.E.2d 350, 362.

In the instant case, we need not rule on the constitutional validity of the neutral reportage doctrine. If the neutral reportage doctrine does survive as a constitutional privilege, or more likely, as a special common law privilege, it would be narrowly limited to a factual situation which is presented when a responsible prominent person or organization makes serious charges against a public figure and those charges are reported in an accurate and disinterested manner. (Comment, *Edwards v. National Audubon Society, Inc.: The Right to Print Known Falsehoods,* (1979 U. Ill. L. F. 943.) In those cases which have recognized the doctrine, it has been because it applied in this limited manner. In *Edwards,* the allegations in question were made by an official of the National Audubon Society, "a responsible prominent organization." (*Edwards v. National Audubon Society, Inc.* (2d Cir. 1977), 556 F.2d 113, 120.) Likewise, in *Krauss,* the accusations were made by an assistant State's Attorney, a locally prominent figure. (*Krauss v. Champaign News Gazette, Inc.*) In the instant case, on the other hand, the allegations of police misconduct were made by unnamed youths who had been arrested by police. The doctrine of neutral reportage does not aid the defendants under these facts. Defendants further contend that counts II and IV of plaintiff's complaint should be dismissed because motive is irrelevant under the neutral reportage doctrine, and those counts contain allegations which are relevant only to defendants' motives in publishing the article in question. However, as we have determined that no neutral reportage privilege could exist here, we must also reject this argument.

■ Finally, since the plaintiff acknowledges and the case law

shows that a police officer is a public official for purposes of first amendment analysis (*Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837; *Angelo v. Brenner* (1980), 84 Ill. App. 3d 594, 406 N.E.2d 38), we must determine whether the complaint sufficiently alleges actual malice. As a public official, the plaintiff must establish with clear and convincing evidence that the defendants made the allegedly libelous statements with actual malice. (*New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 11 L. Ed. 2d 686, 84 S. Ct. 710.) Actual malice is defined to mean publication of false statements with actual knowledge that they are false or with reckless disregard for whether or not they are false. (*New York Times Co. v. Sullivan.*) The concept of recklessness requires a showing by plaintiff that the defendant in fact entertained serious doubts as to the truth of the publication. *St. Amant v. Thompson* (1968), 390 U.S. 727, 20 L. Ed. 2d 262, 88 S. Ct. 1323.

In this regard, bias, ill will, or even hatred of a public official is irrelevant, and only knowing or reckless disregard for the truth is actionable under the *New York Times Co.* test. (*New York Times Co. v. Sullivan.*) A mere grudge against a police officer is not sufficient to establish a deliberate or reckless effort to harm the officer with false statements. (*Beckley Newspapers Corp. v. Hanks* (1967), 389 U.S. 81, 19 L. Ed. 2d 248, 88 S. Ct. 197. See also *Lancaster v. Daily Banner-News Publishing Co.* (1981), 274 Ark. 145, 622 S.W.2d 671 (newspaper executive's grudge against a police officer who had repeatedly arrested his son on drug charges was found insufficient on motion for summary judgment to establish actual malice in connection with the newspaper's editorial allegations of police brutality).) We must emphasize that under some facts, the difference between a mere grudge and an effort to act maliciously might involve a subtle nuance in the evidence. To that end, both the United States and Illinois Supreme Courts have recently pointed out that proving actual subjective malice is a complicated task. *Hutchinson v. Proxmire* (1979), 443 U.S. 111, 120 n.9, 61 L. Ed. 2d 411, 422 n.9; 99 S. Ct. 2675, 2680 n.9; *Catalano v. Pechous* (1980), 83 Ill. 2d 146, 181, 419 N.E.2d 350, 367 (Clark, J., concurring in part, dissenting in part).

■ In the instant case we need only decide the threshhold issue of whether the allegations are sufficient to state a cause of action. We must determine whether the complaint sets forth factual allegations from which actual malice may reasonably be said to exist. The bare assertion of actual malice is not enough. (*Colson v. Stieg* (1982), 89 Ill. 2d 205, 433 N.E.2d 246; *Arlington Heights National Bank v. Arlington Heights Federal Savings & Loan Association* (1967), 37 Ill.

2d 546, 229 N.E.2d 514; *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 239 N.E.2d 837.) In *Coursey*, a complaint which alleged that the defendants

> " 'intending to injure the plaintiff's good name and to injure him in his livelihood, with knowledge that [defendant's statement] was false and with reckless disregard to whether it was false or not, maliciously *** published *** an article containing false, scandalous and malicious libels concerning the [p]laintiff' "

was held to state a cause of action for libel. *Coursey v. Greater Niles Township Publishing Corp.* (1968), 40 Ill. 2d 257, 266, 239 N.E.2d 837, 841-42.

Similarly, in *Weber v. Woods* (1975), 31 Ill. App. 3d 122, 334 N.E.2d 857, the complaint alleged that the

> " 'defendants, well knowing the facts *** but maliciously intending to injure plaintiff and to bring him into public scandal, disrepute and disgrace *** falsely and maliciously published concerning the plaintiff false, scandalous, malicious and defamatory words ***.' " *Weber v. Woods* (1975), 31 Ill. App. 3d 122, 127, 334 N.E.2d 857, 860.

The reviewing court held that the complaint in that case alleged sufficient facts from which actual malice may reasonably be said to exist.

The Illinois Supreme Court most recently examined the requirements for a sufficient allegation of actual malice in *Colson v. Stieg.* The court noted that the complaint in that case was, among other faults, replete with conclusions, not facts. Nonetheless, the court ruled that since pleadings are to be liberally construed, the plaintiff in that case did accomplish the minimal *New York Times* requirement of pleading that a false statement was made knowingly or in reckless disregard of whether it was true or false. *Coursey* and *Weber* were cited as authority for the finding that the complaint was sufficient. *Colson v. Stieg.*

In the case at bar, as in *Colson*, the complaint is somewhat conclusory. However, since the plaintiff has alleged that the defendants acted knowingly or with reckless disregard of the truth in making false statements about the plaintiff in retaliation for certain drug arrests made by the plaintiff, the elements necessary under the *New York Times* rule have been sufficiently alleged. These allegations in the first amended complaint, when taken with the text of the news story incorporated by reference, and the fact that the statements are libel *per se*, suffice to charge actual malice. (*Colson v. Stieg; Coursey v. Greater Niles Township Publishing Corp.*) Therefore, the trial

court's order dismissing the first amended complaint for failure to state a cause of action must be reversed and this cause is remanded for further proceedings consistent with this opinion.

Reversed and remanded.

HARRISON, P.J., and JONES, J., concur.

APPENDIX A

Youths arrested in raid say police abused them

By DAVID WAYMIRE
Of the News-Democrat

BELLEVILLE - Several youths arrested during Thursday night's raid at North End Park in Belleville said police abused their authority during and after the arrests.

The youths asked their names not be used for fear of police reprisals.

Twenty-five youths were arrested in the raid which police say netted 13 pounds of marijuana, assorted other narcotics, a .32 caliber derringer, a handful of knifes and other weapons.

Two men were charged in felony warrants for possession of large amounts of marijuana.

Youths interviewed Thursday night and Friday said police took keys without consent from some youths to search locked glove compartments and trunks and and [sic] did not return all items confiscated in the raid, even though the items did not relate to law violations.

Police Chief Barry Biehl, who was at the park during the raid, said the searches were done with the consent of the youths, "as far as I know.

"I looked in one glove box myself," he said. "I asked the kid if I could, and he said 'Can I go to the bathroom?' I said why. He said 'I have something in there I shouldn't have.'

Again the youth was asked if Biehl could open the glove compartment, and Biehl said the youth agreed. Inside marijuana was found.

Youths told the News-Democrat they were physically abused by patrolman Thomas Fogus, who drove the paddy wagon that took youths to the police station after the arrests.

Five of the arrested youths told a reporter in separate interviews

that Fogus:
- Repeatedly threatened to "bust their. . .teeth out;"
- Hit at least one youth with a nightstick as they wre entering and leaving the paddy wagon used to transport those arrested to jail, and
- Refused to allow the youths to use the bathroom after they arrived at the jail before they were booked.

Fogus denied all the charges. "Don't ask the kids. Do you think we had 33 happy people back there? There was no police brutality. If they had any gripes they had the mayor and chief of police there to complain to."

"You fellows always want to believe the kids. Ask the police, they were there."

He said it was impossible to allow the youths to use bathroom facilities because of the number involved.

The youths said Fogus, wearing plain clothes, refused to give them his name or badge number. However, several pointed him out to a reporter Thursday night.

"I was in the van 40 minutes, I know," one youth said. "He wouldn't let us use the bathroom. One (policeman) let one guy out. The fat guy (whom the youth identified as Fogus) said, "Hey, what are you doing? They can sit in there and piss on themselves."

Fogus said no such incident occurred. The youths said one person kept in the van urinated on himself because bathroom facilities were denied.

Fogus "hit one guy with a flash light," one youth said. A girl arrested said he offered to fight one of the youths. Several said he used a billy club to hit a youth on the legs after others in the paddy wagon refused to maintain silence.

Biehl Friday flatly denied the charges. "That's a goddamn lie. No one was roughed up."

Youths said the raid came suddenly. Some said they had heard rumors that a raid would be held Thursday night, but discounted them.

They gave the following account:

Police drove up to the park without lights or sirens on. The officers said the park was closed and told everyone to get into their cars and leave. As people were driving out, police turned on their red flashing car lights and proceeded to search every car as it left the single entrance to the park.

Persons still standing in the park also were searched, youths said.

Drivers were searched most carefully one youth said. One said police took the car keys out of his car's ignition, unlocked his glove com-

partment, and arrested him after finding one marijuana cigarette inside.

One youth said he was arrested standing in the park when a plastic bag of marijuana was found alongside him.

One 19-year-old youth said police confiscated a cooler of unopened beer, and returned only the cooler to him when he posted bond.

Biehl said he knew nothing of the incident.

Parents who picked up their children after bond was posted Thursday night were upset with the youths. "When does this stage end?" one asked police Capt. Michael Mercurio. "I've told him to stay out of that place," said another. "But he wouldn't listen."

St. Clair County State's Attorney Clyde Kuehn said Friday he could not comment on specific arrests until police reports were turned over to his office.

Police may have been on dubious grounds on some of the arrests after searches without permission, he said.

Any contraband found during an inventory search may be used in court, Kuehn said.