VITO GRISANZIO, d/b/a Capri Restaurant, Plaintiff-Appellee, v. ROCK-
FORD NEWSPAPERS, INC., *et al.*, Defendants-Appellants.

Second District No. 84—0745

Opinion filed April 26, 1985.

Francis E. Hickey and Robert G. Coplan, both of Connolly, Hickey & Oli-
ver, of Rockford, and William S. Brandt, of Nixon, Hargrave, Devans &
Doyle, of Rochester, New York, for appellants.

Peter S. Switzer, of Barrick, Jackson, Switzer, Long & Balsley, of Rock-
ford, for appellee.

JUSTICE LINDBERG delivered the opinion of the court:
Plaintiff, Vito Grisanzio, d/b/a the Capri Restaurant, in Rock-

ford, brought an action for defamation against defendants Rockford Newspapers, Inc., Gannett News Service, Inc., Tom Schafer and Dave Daley in the circuit court of Winnebago County. Defendants' motion to dismiss for failure to state a cause of action (Ill. Rev. Stat. 1983, ch. 110, pars. 2—615, 2—619) was denied. However, the trial court found that its order involved a question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal may materially advance the ultimate termination of the litigation, and we allow the appeal. (87 Ill. 2d R. 308.) The question served to us by the trial court is whether an article published by defendants is libelous *per se* of the plaintiff. We hold it is not and reverse the order of the circuit court.

The article complained of by plaintiff was written by Tom Schafer, under whose name appears "Gannett News Service," and was printed on pages 1A, 6A, and 7A of the March 4, 1984, edition of the Sunday Register Star in Rockford. On page 1A the headlines of two articles by Schafer were entitled respectively,

> "THE MOB IN ROCKFORD
> Local underworld is simple network with roots planted in time of economic needs"

and,

> "THE 'HAND' IN BUSINESS
> Mob kingpins are landlords to local legitimate enterprise."

On pages 6A and 7A, the articles which began on page 1A are continued under these headlines respectively:

> "THE MOB IN ROCKFORD
> A Special Report of Business."

The exhibit attached to plaintiff's complaint containing photocopies of the articles apparently reflects only a part of what appears on pages 6A and 7A but appears sufficient for the purpose of our disposition.

Plaintiff's allegations of libel *per se* specified in his complaint are that the articles damaged plaintiff in that they: (1) charged plaintiff with the commission of a crime; (2) induced the reader to reasonably believe a crime was committed by plaintiff; (3) impeached plaintiff's reputation for honesty and integrity; and/or (4) prejudiced or injured plaintiff in his business or trade. The article forming the basis of plaintiff's complaint follows. The specific assertions in the article upon which plaintiff bases his allegations of defamation are underscored. Further, the paragraphs are serially numbered in brackets for the convenience of the reader.

## "THE 'HAND' IN BUSINESS
## MOB KINGPINS ARE LANDLORDS
## TO LOCAL LEGITIMATE ENTERPRISE

By Tom Schafer
Gannett News Service

■ The white-stuccoed Capri Restaurant, 313 E. State St., a frequent stop for politicians, the media and pasta lovers, stands out amid the turn-of-the-century redevelopment projects preferred by city planners.

■ It also stands out in law enforcement intelligence files. Some of the Capri's patrons may know—most probably don't—that the East State Street building and property are owned by Joseph Zammuto, the longtime head of the Rockford Mafia family, who investigators now believe serves as a semi-retired counselor.

■ The lot and building housing the Capri in downtown Rockford are part of the network of legitimate business interests of people with underworld ties that spreads throughout Rockford and northern Illinois.

■ Zammuto owns the downtown Capri property, according to Winnebago County tax records. He also owns, those same records show, the property housing Giuseppi's Italian Restaurant and the now-closed North Towne Mini Golf at 950 Halsted Road and property at 111 Kilburn Ave.

■ Rockford police say they suspect he owns other properties through secret trusts or front-men. At one time he also owned, or held interest in, the North Towne Lounge, Reliable Distributing Co., the Dr. Pepper Bottling Co. and Blackhawk Bottling Co., according to police and FBI intelligence reports and the Rockford City Directory.

■ But no one except Zammuto and his intimates may ever learn all he owns. While authorities have some ideas about what the mob does and owns, for the most part such knowledge is elusive, in part because Mafia members have become expert at cloaking their legitimate business holdings. As one veteran federal investigator put it: 'These people are like cockroaches. You step on them one place and they turn up somewhere else.'

■ In Rockford, for example, Nancy Vince, wife of Charles Vince, whom FBI files say is among the Rockford Mafia's top leaders, held a liquor license for StaVon Tap at State and Avon Streets, according to city records. She transferred it to

Salvatore Galluzzo, identified in police reports as a mob soldier.

■ Galluzzo moved the business to 1049 W. State St. and opened Night and Day Disco. When Galluzzo closed the troubled nightspot, the license was transferred to Frank A. Buscemi, son of reputed mob-boss Frank J. Buscemi. Buscemi opened Plaza Suite, 640 Hollister Ave., which went bankrupt in 1983. Bankruptcy records filed in Winnebago County Circuit Court show that Buscemi's father had a substantial interest in the business.

■ Beside his interest in Plaza Suite, Frank J. Buscemi owns the property and business of Sam's Pizza, 1029 E. Harlem Road, Rondinella Foods, Inc., 1128 S. Winnebago St., and Stateline Vending and Amusement Co., 326 W. Jefferson St., according to county tax records.

■ Buscemi sold Rondinella in about 1981, but not the building and property, to Salvatore DiGiacomo and Alfonso DiGiacomo, according to reports filed with the Illinois Secretary of State. The DiGiacomos are connected with Galluzzo in the pizza business.

■ Who are these reputed mobsters? To hear from family, friends and acquaintances, they are 'nice guys,' strong family men. Other acquaintances call them mysterious and to be feared; few seem to know what they do for a living.

■ Joseph Zammuto Jr. told FBI agents in 1967 his father feels bad about the adverse publicity he has received as an alleged Mafia leader because of the effect it might have on his grandchildren.

■ 'He said his father was heartbroken when his photograph appeared in Life magazine, in the late 1960s, *** and he actually cried when he learned that his grandson had become aware of it,' the FBI report states.

■ Others identified in FBI documents aren't described in such flattering terms. Both Joseph Maggio, who was gunned down in 1980, and Joseph 'Gramps' Marinelli, who died of natural causes the same year, were to be considered 'armed and dangerous,' FBI reports say.

■ Rockford's small 'family' of about 20 is part of a nationwide criminal cartel known as the La Cosa Nostra to the FBI, and the Mafia to most everyone else. Those formally welcomed in the family are known as 'made' members and are sponsored by other members and initiated. No one

knows for sure what criteria are used to determine who should become a member, but in the old days, according to government informants, a prospect had to kill someone in order to join some families.

■ Across the country, the Mafia is a loose-knit organization of 25 active outfits or families, located mostly in Northern industrial cities, that work together on criminal and legitimate activities.

■ For example, local police believe the local mob approved of New York Mafia families controlling pornography in Rockford, in exchange for letting Rockford mobsters operate franchise schemes on the East Coast.

■ No one knows how much money the mob earns, because obviously they don't keep ledger sheets on profits and losses and report to the IRS each April 15. Admittedly inexact estimates, by the FBI, of the Mafia's annual take begin at $120 billion a year and go up from there.

■ Those estimates don't include the mob's move into legitimate businesses, and the unfair advantages they have when it comes to untaxed capital to invest and the fear they instill in citizens."

■ An action for defamation based on libel *per se* requires that the words used are in and of themselves so obviously and naturally harmful that proof of special damages is unnecessary. (*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 348.) In Illinois, for a writing to be libelous *per se*, it must contain a false statement which imputes to the plaintiff any of the following offensive categories: "(1) the commission of a crime; (2) the infection with a loathesome disease; (3) the unfitness or want of integrity in performing the duties of an office or employment; or (4) words which adversely reflect on a particular party's abilities in his business, trade or profession." *Levinson v. Time, Inc.* (1980), 89 Ill. App. 3d 338, 340-41, 411 N.E.2d 1118, 1121. Accord, *Fried v. Jacobson* (1983), 99 Ill. 2d 24, 27.

The Supreme Court of Illinois has employed the rule of innocent construction to determine whether the particular language used constitutes libel *per se*. That rule, as recently modified by the supreme court, states:

"[A] written or oral statement is to be considered in context, with the words and the implications therefrom given their natural and obvious meaning; if, as so construed, the state-

ments may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff it cannot be actionable *per se.* This preliminary determination is properly a question of law to be resolved by the court in the first instance; whether the publication was in fact understood to be defamatory or to refer to the plaintiff is a question for the jury should the initial determination be resolved in favor of the plaintiff." *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352.

Plaintiff alleges that defendants' statements were defamatory in that they falsely accused him of committing a crime and harmed him in his business. An allegation that a statement falsely accuses a person of committing a crime is sufficient to support a defamation action against the person making the statement. (*Zeinfeld v. Hayes Freight Lines, Inc.* (1968), 41 Ill. 2d 345, 348; *Cartwright v. Garrison* (1983), 113 Ill. App. 3d 536, 540, 447 N.E.2d 446, 448; *Fogus v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1060, 1062, 444 N.E.2d 1100, 1101; *Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 456, 395 N.E.2d 1185, 1189.) Thus, we must determine whether the statements in issue here accuse plaintiff of the commission of crimes.

In determining whether these statements accuse plaintiff of committing crimes, the innocent-construction rule must be applied. This rule requires that the statements be "considered in context, with the words and the implications therefrom given their natural and obvious meaning" (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352.) If, under this construction the statements may reasonably be innocently interpreted or reasonably be interpreted as referring to someone other than the plaintiff, then it is not actionable as a matter of law. 92 Ill. 2d 344, 352.

Here, the context in which the allegedly defamatory statements appear is in an article dealing with the Mafia. More specifically, the article describes businesses of alleged Mafia leader Joseph Zammuto, who is identified as the owner of the property and building housing the business of the Capri Restaurant.

The article, and particularly those sentences emphasized by plaintiff in his complaint and set out above, fails to identify plaintiff, Vito Grisanzio, individually at any time. Further, the article cannot be read reasonably to accuse plaintiff as the operator of the Capri Restaurant of having committed a crime or to lack honesty or integrity in his trade or business. Even if the reader were to carelessly conclude from the headlines and the first two paragraphs that the

Capri Restaurant *business* was owned by Zammuto or was Mafia-owned, he would be disabused of that misapprehension by a continued reading of the article which reinforces the statement in the second paragraph of the article that the building and property are the business interests of Zammuto.

■ At best, from the standpoint of the plaintiff, it would appear that mention of the Capri Restaurant, a frequent stop for politicians, the media and pasta lovers was a "hook" to interest readers to read the story. However, a reading of the entire article together with its headlines and, according to plaintiff, "Black Hand" graphics, would not lead a reasonable person to ascribe criminal activities to the Capri. The article may be reasonably interpreted as referring to persons and businesses other than plaintiff's business and therefore is not actionable as a matter of law. *Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352; *Cartwright v. Garrison* (1983), 113 Ill. App. 3d 536, 541, 447 N.E.2d 446, 449.

Essential to plaintiff's theory is that a reader of the article reasonably would not perceive the distinction between the ownership of the business of the restaurant and ownership of the property wherein the restaurant is operated. However, our reading of the article satisfies us that a reader reasonably would perceive the distinction. For example, the article includes a statement that the lot and building housing the Capri in downtown Rockford are part of the network of legitimate business interests of people with underworld ties. Not only does the statement not mention the business of the Capri, but immediately following that statement the article ascribes ownership of the Capri property, as well as other properties, to Zammuto.

Nor do we believe the article, or statements alleged to be specifically defamatory, impute the commission of crimes to plaintiff. (See *Fogus v. Capital Cities Media, Inc.* (1982), 111 Ill. App. 3d 1060, 1062, 444 N.E.2d 1100, 1101.) On appeal, plaintiff contends that the articles charge he is engaged in mob action (Ill. Rev. Stat. 1983, ch. 38, par. 25—1), or conspiracy (Ill. Rev. Stat. 1983, ch. 38, par. 8—2), which are crimes in Illinois. While a statement need not charge a person with a criminal offense with the precision of an indictment in order to be actionable (*Catalano v. Pechous* (1980), 83 Ill. 2d 146, 157; *Makis v. Area Publications Corp.* (1979), 77 Ill. App. 3d 452, 457, 395 N.E.2d 1185, 1189), words are not actionable if they reasonably may be innocently interpreted. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352; see generally *Antonelli v. Field Enterprises, Inc.* (1983), 115 Ill. App. 3d 432, 450 N.E.2d 876.) No person

could reasonably conclude from reading the article that the business of the Capri Restaurant or its owner were involved in mob action or a conspiracy. It would require an entirely unreasonable and strained reading of the article to arrive at such a conclusion. Contrary to plaintiff's assertions, the article simply does not make charges of the commission of criminal offenses by plaintiff individually or doing business as the Capri Restaurant.

Plaintiff also argues that the statements injured his profession. A false statement which imputes that a person lacks ability in his profession or is unfit to perform his employment duties is actionable as defamation. (*Cartwright v. Garrison* (1983), 113 Ill. App. 3d 536, 542, 447 N.E.2d 446, 449.) Applying the innocent-construction rule, we conclude that the allegedly defamatory statements may reasonably be read as not imputing any unfitness or lack of ability on plaintiff's part. Again, the article states in part that the lot and building housing the Capri Restaurant in downtown Rockford are part of a network of legitimate business interests of people with underworld ties that spreads throughout Rockford and northern Illinois. Neither the expressions to which plaintiff directs our attention nor the article read as a whole can be reasonably interpreted as imputing unfitness or lack of ability on plaintiff's part or on the part of his business and therefore are not actionable as a matter of law. *Matchett v. Chicago Bar Association* (1984), 125 Ill. App. 3d 1004, 1010, 467 N.E.2d 271, 276.

As a result of our disposition of these issues on the basis of the innocent-construction rule, we need not consider the other arguments of the parties. The judgment of the circuit court of Winnebago County is reversed.

Reversed.

SCHNAKE and STROUSE, JJ., concur.