THE PEOPLE *ex rel.* RICHARD M. DALEY, Plaintiff-Appellee, v. WARREN MOTORS, INC. (formerly d/b/a Warren Buick, Inc.), *et al.*, Defendants-Appellants.

First District (5th Division)   No. 84—1082

Opinion filed September 6, 1985.

John J. O'Toole and Edward W. Nicewick, both of Nisen, Elliott & Meier, of Chicago, for appellants.

Richard M. Daley, State's Attorney, of Chicago (Henry A. Hauser, Deputy State's Attorney, and Mark R. Davis, Susan Condon, and Daniel Cannon, Assistant State's Attorneys, of counsel), for appellee.

JUSTICE SULLIVAN delivered the opinion of the court:

Plaintiff, the Cook County State's Attorney, brought this action on behalf of the People of the State of Illinois seeking an accounting

and to impose a constructive trust in favor of Cook County upon certain tax reduction benefits realized by defendants, Warren Motors, Inc. (the dealership), and Warren Ottinger (Ottinger) from an illegal real estate tax reduction scheme perpetrated by certain other defendants, including several former employees of the board of appeals of Cook County (the board), all of whom were voluntarily dismissed from the action prior to trial.[1]

Plaintiff's second amended complaint alleges, and defendants do not dispute, that at all times relevant to this case, Ottinger owned the property at issue, which consisted of his personal residence—a condominium—and four parcels of land upon which the dealership was located. It is also undisputed that the board was established to review taxpayers' complaints of property overevaluation by the Cook County assessor and that the rules of the board required such complaints to be submitted on a preprinted form signed by the taxpayer or his attorney. After a complaint was filed, a receipt tab was detached therefrom and mailed to the taxpayer notifying him of the date of the required public hearing thereon. Due to the large volume of appeals received by the board each year, complaints were reviewed by deputy commissioners, who were appointed as assistants to the board's two elected commissioners and authorized to approve reductions in tax assessments following a hearing at which it was the burden of the taxpayer to prove, by appraisal or other documentation, that the assessment was excessive. Individual taxpayers were allowed to appear at the hearing *pro se*, but it was a board requirement that corporate taxpayers be represented by a licensed attorney. Failure to appear at the hearing resulted in a judgment of "no change," *i.e.*, denial of the request for an assessment reduction. Where a reduction was approved, however, the deputy commissioner subscribed his initials, along with those of the commissioner he represented and a brief statement of the reason for the reduction and the method employed in determining that the original assessment was erroneous. All reduction approvals were ultimately sent for final review to the commissioner whose initials had been subscribed thereon by the deputy.

In the instant case, the second amended complaint also alleged, essentially, that beginning sometime in 1974 and continuing until mid-1980, certain board employees, including Thomas Lavin and Donald Erskine—deputy commissioners to Commissioners Harry H. Semrow

---

[1]At least two of these defendants were successfully prosecuted in Federal criminal cases and, according to plaintiff, the others have either settled their cases or remain defendants in separate, pending suits.

and Seymour Zabin respectively—and James Woodlock—a computer operator—devised and operated a scheme whereby persons employed by them as "runners" representing themselves as tax consultants solicited taxpayers wishing to obtain tax assessment reductions on their property. Lavin testified that typically the fraudulent complaint was prepared by either the runner, Erskine or himself and, as was the procedure with legitimate complaints, a hearing date was scheduled and notice thereof was mailed to the taxpayer-complainant. When the taxpayer, who was secretly pre-instructed to disregard the notice, failed to appear at the hearing, the complaint, which was previously "keyed" with the runner's initials, was placed in a "no appearance" drawer established to temporarily delay disapproval of complaints by taxpayers who were unable to appear at the scheduled hearing. After a few weeks, either he or Erskine removed the fraudulent complaint and approved the reduction requested thereon by forging the initials of one of the commissioners on the file beneath his own and then placed it among other legitimately approved reduction files for entry into the computer and other routine processing, including the mailing of notification of the reduction to the taxpayer, by other board employees who were unaware of the scheme. In exchange for a reduction of the quadrennial assessment, taxpayers who participated in the scheme paid a cash "fee" of approximately one-half of the first year's tax savings, which was then divided between the runner and the deputy commissioner who authorized it.

Ottinger testified, as an adverse witness, that he and Larry Kelly, one of Lavin's runners, had been close friends as well as business acquaintances since 1973 and that Kelly worked as an insurance adjuster and had adjusted a fire loss on his wife's condominium. In late 1976, during a conversation wherein he (Ottinger) complained to Kelly about the high real estate taxes he paid on the dealership property, Kelly offered to help him secure an assessment reduction thereon. He did not ask nor did Kelly explain how the reduction would be accomplished and he knew nothing about board procedures; however, he admitted that he did not complete a complaint form, submit any documentation of value to support the reduction or appear, personally or through an attorney, at a hearing thereon. The reduction was approved, but a few weeks later he received notification of a proposed increase in the 1977 assessment. He called Kelly who assured him—again without explanation or any request for documentation to support the reduction—that he would "take care of it." Shortly thereafter, he received a notice from the board that the previous year's reduction had been restored. He did not know of Lavin's involvement

in securing the lowered assessment and, in fact, did not even meet Lavin until late 1977 when Kelly introduced him as "Judge Lavin" at a chance meeting in a bar. He first learned that Lavin had been employed by the board in spring, 1978 when Lavin came to the dealership and completed a financial statement necessary to secure financing for a new car he wished to purchase which contained his employment history. Lavin then told him that he was in the process of starting a real estate tax consulting business and offered to help him obtain tax reductions on his property. He told Lavin that Kelly had "handled everything" for him in the past, but when Lavin informed him that he, not Kelly, was "doing it now," he gave Lavin the permanent index number for his condominium and employed him to obtain an assessment reduction thereon, for which he later paid Lavin a cash fee of $600—an amount representing 25% of the tax savings for the balance of the 1976 through 1979 quadrennial tax period. He did not become aware of the scheme until he heard news reports and received a telephone call from the Federal Bureau of Investigation concerning it in late 1979. It was at about the same time that he had a meeting with Lavin at a restaurant and, in the course of a conversation concerning the previous assessment reductions, he told him that he had paid Kelly nearly $24,000 in connection with the dealership valuation. Lavin then informed him that he should have paid only $11,000 or $12,000, i.e., one-half of the first year's savings. Although Ottinger also testified at trial that he did not become aware of Lavin's involvement in the scheme until late 1979, he acknowledged having testified in a Federal criminal case against Kelly that he was aware of Lavin's role at the time of this meeting.

After providing a general description of the mechanics of the scheme, Lavin further testified that in the instant case, he prepared complaint forms and affidavits for the four parcels of land upon which the dealership was located, signing as complainant-taxpayer the fictitious name "George Warren," and then processed the fraudulent complaint as described above. Although his share of the amount Kelly collected from Ottinger was to have been $6,000, i.e., one-quarter of the first year's savings of $24,000, Kelly gave him $8,000, explaining that the additional $2,000 was a token of his appreciation for Lavin's assistance in processing this and other cases he brought to him. When, in early 1979, he learned that Ottinger had paid Kelly $24,000, he told him (Ottinger) that he had overpaid and that the correct amount should have been about $12,000. He also informed Ottinger of the $2,000 "tip" and assured him that he would question Kelly about the overpayment. Although his employment with the board terminated in

January 1978, he continued to process fraudulent assessment reductions in the evenings, including the reduction on Ottinger's condominium. The remainder of Lavin's testimony was essentially the same as Ottinger's. Following the trial, the court entered judgment against both defendants, ordered an accounting and the imposition of a constructive trust on the amount of tax savings realized by them, plus interest, and this appeal followed.

OPINION

Defendants first contend that despite plaintiff's designation of this action as one for the imposition of a constructive trust, since the only relief sought was the recovery of money damages equitable jurisdiction was improperly invoked and resulted in the denial of their constitutional right to a trial by jury.

■ Initially, we note that an action for a constructive trust is not one for recovery or compensation under any theory of tort or contract law. (*County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 344 N.E.2d 540.) Rather, it is a restitutionary remedy which arises by operation of law (*Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 147 N.E.2d 69; *A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 477 N.E.2d 1326; *Eiseman v. Lerner* (1978), 64 Ill. App. 3d 185, 380 N.E.2d 1033; *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 344 N.E.2d 540), and is imposed by a court on equitable and public policy grounds in situations where a person holding money or property would profit by a wrong or be unjustly enriched at the expense of another if he were permitted to retain it (*A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 477 N.E.2d 1326; *Roth v. Carlyle Real Estate Limited Partnership VII* (1984), 129 Ill. App. 3d 433, 472 N.E.2d 836; *Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 438 N.E.2d 663; *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 411 N.E.2d 1067; *County of Lake v. X-Po Security Police Service, Inc.* (1975), 27 Ill. App. 3d 750, 327 N.E.2d 96). The purpose of a constructive trust is to compel the party unfairly holding the money or property to convey it to whom it justly belongs. *LaBarbera v. LaBarbera* (1983), 116 Ill. App. 3d 959, 452 N.E.2d 684; *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 344 N.E.2d 540; see Lenhoff, *The Constructive Trust as a Remedy for Corruption in Public Office*, 54 Colum. L. Rev. 214 (1954); Ashbell, *The Third Party Trusteeship: An Equitable Remedy Against Bribers and Corrupters of Public Officials*, 67 Ill. B.J. 160 (1978).

In the case before us, plaintiff alleged, and presented evidence at trial, that defendants were participants in a scheme whereby certain

public officials breached their fiduciary duty to the People of the State by using their positions of public trust to fraudulently reduce real estate tax assessments, and that as a result thereof, realized substantial benefits in the form of tax savings to which they were not entitled. The complaint prayed for an accounting of, and the imposition of a constructive trust upon, the amounts which, plaintiff alleged, rightfully belong to Cook County. As stated in *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 632-33, 344 N.E.2d 540, 549, "[t]he recognition, execution and control of a trust or equitable interest is a matter exclusively within the jurisdiction of equity [and that] jurisdiction is original, inherent and plenary." The *Barrett* court further held that "[w]hen chancery exercises its exclusive jurisdiction to declare the County's equitable interest, it must then afford, as an incident, the complete remedy obtainable through an accounting. Where equity has jurisdiction for the purpose of granting equitable relief, the court may determine all issues of the case whether legal or equitable [citations] including damages. [Citations.]" *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 633, 344 N.E.2d 540, 549.

Defendants further assert, however, that the elements necessary to form the basis for imposition of a constructive trust, and thus to invoke equitable jurisdiction, were absent in this case. Specifically, they maintain that there was no (a) fiduciary relationship between the parties to this litigation or (b) trust *"res"* upon which to impose a trust.

As to (a), we note that although constructive trusts generally arise where there is either fraud or the abuse of a confidential or fiduciary relationship (*Carroll v. Caldwell* (1957), 12 Ill. 2d 487, 147 N.E.2d 69; *LaBarbera v. LaBarbera* (1983), 116 Ill. App. 3d 959, 452 N.E.2d 684; *Zack Co. v. Sims* (1982), 108 Ill. App. 3d 16, 438 N.E.2d 663; *Eiseman v. Lerner* (1978), 64 Ill. App. 3d 185, 380 N.E.2d 1033; *County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 344 N.E.2d 540), courts have often held that the extent of their utilization is not limited to those grounds (*Roth v. Carlyle Real Estate Limited Partnership VII* (1984), 129 Ill. App. 3d 433, 472 N.E.2d 836; *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 411 N.E.2d 1067; *County of Lake v. X-Po Security Police Service, Inc.* (1975), 27 Ill. App. 3d 750, 327 N.E.2d 96). "The particular circumstances in which equity will impress a constructive trust are as numberless as the modes by which property may be obtained through bad faith and unconscientious acts." (*County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 627, 344 N.E.2d 540, 545; see also 4 Pomeroy's Equity Jurisprudence sec. 1045, at 97 (5th ed. 1941).) As noted above, an action for a

constructive trust is designed to prevent profit from wrongful activity and unjust enrichment and is maintainable in all cases where a person has received money or property which, in equity and good conscience, he ought not be allowed to retain, *regardless of whether a fiduciary relationship exists between him and the aggrieved party.* (*Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 411 N.E.2d 1067.) Indeed, in *Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 402 N.E.2d 181, a case involving bribery by the defendants of a city alderman to secure favorable rezoning on certain property, our supreme court stated,

> "It is well established that a public officer occupies a fiduciary relationship to the political entity on whose behalf he serves. [Citations.] Upon allegations that those fiduciary responsibilities have been breached, a cause of action on the part of represented beneficiaries to seek restitution has been recognized. [Citations.] That the defendants rather than [the public official] are the parties against whom the [County] now seeks recovery does not warrant dismissal of its amended complaint. It is a fundamental rule in the law of restitution that '[a] third person who has colluded with a fiduciary in committing a breach of duty, and who obtained a benefit therefrom, is under a duty of restitution to the beneficiary.' [Citations.] Recognition of this salutary principle has resulted in the imposition of constructive trusts on benefits obtained by third persons *through their knowledge of or involvement in a public official's breach of fiduciary duty.* [Citations.]" (Emphasis added.) 78 Ill. 2d 555, 564-65, 402 N.E.2d 181, 186; see also Ashbell, *The Third Party Trusteeship: An Equitable Remedy Against Bribers and Corrupters of Public Officials,* 67 Ill. B.J. 160 (1978).

In *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 411 N.E.2d 1067, another case involving payments to municipal officers for building permits and favorable rezoning, the court, relying on *Kenroy,* held that "[a]lthough the transaction assailed in constructive trust cases is usually one between the parties directly, this is not a prerequisite. [Citation.] The way in which the particular transaction arises is immaterial. [Citation.] A third party who induces a breach of a trustee's duty of loyalty, or participates in such a breach, or knowingly accepts any benefit from such a breach, becomes directly liable to the aggrieved party." 89 Ill. App. 3d 450, 455, 411 N.E.2d 1067, 1070.

■ Therefore, while it is true that there was no fiduciary relationship between defendants and the county, the allegations charging

that they knew or reasonably should have known that the benefits they received from the tax assessment reductions were the product of such a breach by officials of the board were sufficient to form the basis for an equitable action for restitution through the imposition of a constructive trust.

■ Furthermore, it is clear from the principles enunciated above that defendants' claim as to the lack of a trust *res* is also without merit. The cases expressly hold that a constructive trust will reach any benefit obtained by a party through his knowledge of or involvement in the breach of a fiduciary's duty (*Chicago Park District v. Kenroy, Inc.* (1980), 78 Ill. 2d 555, 402 N.E.2d 181; *City of Chicago ex rel. Cohen v. Keane* (1976), 64 Ill. 2d 559, 357 N.E.2d 452; *Village of Wheeling v. Stavros* (1980), 89 Ill. App. 3d 450, 411 N.E.2d 1067; *A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 477 N.E.2d 1326), including real and personal property, choses in action and funds of money (*County of Cook v. Barrett* (1975), 36 Ill. App. 3d 623, 344 N.E.2d 540). The maxim is, perhaps, best explained in the Restatement of Restitution:

> "A person confers a benefit upon another if he gives to the other possession of or some other interest in money, land, chattels, or choses in action, performs services beneficial to or at the request of the other, satisfies a debt or a duty of the other, or in any way adds to the other's security or advantage. He confers a benefit not only where he adds to the property of another, but also where he saves the other from expense or loss. The word 'benefit,' therefore, denotes any form of advantage." (Restatement of Restitution sec. 1, Comment b (1937).)

Here, there is no dispute that defendants received a benefit in the form of calculable savings resulting from the illegal reductions of their property tax assessments, and it is the amount of those savings, together with the applicable amount of interest thereon, which comprise the trust *"res."*

■ In summary, we conclude that the elements necessary to form the basis for an equitable action for a constructive trust, were adequately set forth in this case and that defendants were not, therefore, entitled to a trial by jury.

■ Defendants also contend that the trial court's finding that they knew or should have known that the tax assessment reductions were effectuated by illegal means was contrary to the manifest weight of the evidence. Essentially, it is Ottinger's position that in addition to his own testimony denying any knowledge of the illegal scheme until late 1979, (1) the testimony of Lavin, that he did not

even know Ottinger at the time he processed the dealership reduction; (2) a letter from an assistant United States Attorney who was a prosecutor in a Federal criminal case against Kelly at which he (Ottinger) testified for the government, which stated that the evidence presented thereat did not indicate that he was aware of the means by which the reductions were achieved; and (3) the fact that he paid the fees to Kelly and Lavin by check rather than in cash, all establish his lack of knowledge. We disagree.

"A person has notice of facts giving rise to a constructive trust not only when he knew them, but also when he should know them; that is when he knows facts which would lead a reasonably intelligent and diligent person to inquire whether there are circumstances which would give rise to a constructive trust, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know of such circumstances" (Restatement of Restitution sec. 174, comment (a) (1937); see also Restatement (Second) of Trusts sec. 297, comment (b) (1959); *A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 477 N.E.2d 1326); and where "an officer of a corporation has knowledge or notice of a fact, that knowledge or notice is generally imputed to the corporation" (*A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 662, 477 N.E.2d 1326, 1333). Finally, in cases involving the imposition of a constructive trust, the findings of the trial court are to be given great weight and will not be disturbed unless they are contrary to the manifest weight of the evidence. *A.T. Kearney, Inc. v. INCA International, Inc.* (1985), 132 Ill. App. 3d 655, 477 N.E.2d 1326.

Here, the record discloses numerous facts which, in our view, support the trial court's finding that Ottinger, and thus the corporation, were chargeable with knowledge that the benefits they received from the assessment reductions were obtained illegally. Specifically, it was established—through Ottinger's own testimony—that he was the president and sole shareholder of a large automobile dealership and had substantial experience in matters of business and finance; that he and Kelly were close friends for several years prior to the inception of the assessment scheme; that to Ottinger's knowledge, Kelly was an insurance adjuster, not an attorney or a tax consultant; that when Kelly offered to "help" him secure a reduction of the 1976-1979 quadrennial assessment of the dealership, he did not inquire, nor did Kelly provide any explanation, as to how this would be accomplished; and that he did not supply Kelly with any documentation which might support such a reduction, file a complaint, appear or—as was required by the

board rules—retain an attorney to appear on behalf of the dealership, sign any papers or, in fact, do anything more than give Kelly the permanent index numbers for the four parcels of property. Upon notice from the board that the reduction had been approved, he gave Kelly a check for nearly $24,000—stating that he gave a check because he did not carry that large an amount in cash. He assisted Kelly in cashing this check by calling his bank and giving his personal approval for them to do so that same day. A few weeks later, when he called Kelly regarding a notice he had received of a proposed increase for the 1977 tax year, Kelly merely assured him that he would "take care of it"; as before, no inquiries were made, nor explanations given, as to the procedure by which Kelly would do so, and, again, he supplied no affidavit or other documentation to support the reduction restoration which remained in effect through 1979—the end of the quadrennial period.

A similar scenario occurred in spring, 1978, when Ottinger had a meeting with Lavin—who was introduced to him as "Judge Lavin" by Kelly the previous year—wherein Lavin informed him that he was a former board employee, that he was in the process of starting a tax consulting business and that he could help Ottinger secure a tax reduction on his condominium. Ottinger agreed to the proposition and the reduction was processed, as before, without documentation or action on Ottinger's part, for a "fee" of $600, which, according to Ottinger, he paid Lavin in cash. Moreover, although Ottinger testified at trial that he was unaware of Lavin's involvement in the illegal scheme until exposure of it in the media, he previously testified in Federal court that he knew of Lavin's involvement at the time of this meeting.

■ We believe that the trial court's finding that "a reasonable businessman in Ottinger's position should have known under the totality of circumstances from the inception of his transactions with both Kelly and Lavin, that the assessment reductions could not be accomplished absent noncompliance with the applicable law and rules of the Board of Appeals [that] any reasonable inquiry such as under the circumstances it was Ottinger's duty to make would have led to the complete exposure, if not the prevention, of that illegality [; that] Ottinger and through him, Warren Motors, therefore, constructively knew of the illegality in the assessment reductions on the dealership and condominium properties from their inception [; and that] such reductions were effected through fraud and the violation of fiduciary duty by public officials or employees," were clearly supported by the evidence. We are not persuaded otherwise by the letter from the United States

Attorney since, (a) although attached to defendants' motion for summary judgment, it was neither offered or admitted into evidence at trial and, more importantly, (b) the opinion expressed therein, given in response to defendants' inquiry, was based only upon the evidence, including the testimony of Ottinger, presented against Kelly which, the prosecuting attorney merely stated "did not show" knowledge of the scheme by Ottinger.

In any event, the record further shows, as noted previously, that the lowered assessment on the dealership remained in effect through 1979—the end of the quadrennial period and resulted in the receipt of benefits by Ottinger and the dealership in the form of reduced tax obligations into the 1980 calendar year, by which time, Ottinger admitted, he had acquired actual knowledge of the scheme through media reports and the Federal Bureau of Investigation. Thus, viewing the record in its entirety, we find no error in the decision of the trial court to order an accounting and the imposition of a constructive trust upon the tax benefits realized by Ottinger and the dealership through their knowledge and involvement in the illegal assessment reduction scheme devised and operated by various board employees.

■ Although in the brief, defendants also set forth contentions that it was plaintiff's duty to "rectify the alleged improper assessments upon receipt of knowledge of the activities of Kelly, Lavin and other Board employees"; and that the amount of the judgment, but particularly the rate of interest applied thereon, was improper, they made no arguments nor presented any authority in support thereof. Consequently, under Supreme Court Rule 341 which provides that "the appellant's brief shall contain *** argument, which shall contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on" and that "points not argued are waived and shall not be raised in the reply brief, in oral argument or on petition for rehearing," we find that defendants have waived these issues for purposes of review. 87 Ill. 2d 341(e)(7).

For the reasons stated, the order of the trial court is affirmed.

Affirmed.

MEJDA, P.J., and LORENZ, J., concur.