FLIP SIDE, INC., et al., Plaintiffs-Appellants, v. CHICAGO TRIBUNE COMPANY et al., Defendants-Appellees.

First District (3rd Division)   No. 1—88—1938

Opinion filed October 31, 1990.—Rehearing denied January 8, 1991.

D. Alan Harris, of Chicago, for appellants.

Samuel Fifer, Dale M. Cohen, Karen H. Flax, and Joseph P. Thornton, all of Chicago, for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiffs Flip Side, Inc., Carl Rosenbaum and Lawrence Rosenbaum filed a three-count complaint against defendants Chicago Tribune Company, Tribune Media Services, Inc., Richard Locher and Max Collins. Count I alleges an action entitled libel, and according to plaintiffs it is sufficient to state an action for libel *per se* and *per quod*. Count II alleges an action entitled invasion of privacy. Count III alleges an action entitled intentional infliction of severe emotional distress. Defendants filed a motion to dismiss the complaint on the basis that it fails to state a claim upon which relief can be granted. The complaint and the motion to dismiss are both supported by exhibits depicting the subject matter of the lawsuit. The motion to dismiss was granted. We affirm.

Plaintiff Flip Side, Inc., is an Illinois corporation with its principal

place of business in Arlington Heights, Illinois. It is engaged in the record business, and it has been engaged in the concert promotion business. Plaintiffs Carl and Lawrence Rosenbaum are brothers who are employed as representatives of Flip Side, Inc. The complaint does not allege any other descriptive facts about the plaintiffs or their operations.

The subject matter of the lawsuit is the Dick Tracy comic strip which appears daily in the Chicago Tribune. Defendant Chicago Tribune Company publishes the Chicago Tribune. Defendant Tribune Media Services, Inc., owns the copyright to Dick Tracy. Defendant Richard Locher is the artist and defendant Max Collins is the writer for Dick Tracy. The plaintiffs contend "that the strips make false and defamatory statements about both the corporate and individual plaintiffs, that they wrongfully invaded individual plaintiffs' right to privacy, and that they subjected the individual plaintiffs to an intentional infliction of severe emotional distress."

Based upon the exhibits filed by the parties and upon facts which we take judicial notice, we recognize that Dick Tracy is a nationally known, continuing episodic comic strip that has existed since 1931. Over the years, in addition to the square-jawed crime fighter, it has included such inherently fictional characters as Puttyface, a criminal scoundrel who can make his face change its shape; Pruneface, a villain with prune-like facial features; Moon Maiden, an iniquitous woman whose head sprouts antennae; Hammerhead, a terrorist whose head resembles that of his namesake the hammerhead shark; Sam Catchem, a detective; and B.O. Plenty and Gravel Gertie, whose first child, Sparkle Plenty, spawned the sale of popular Sparkle Plenty dolls. Some of the other inherently fictional characters that are readily recognizable include the Mole, 88 Keys, Mumbles, Itchy, Dr. Freezdrei, and Flattop. Most of these enchanting but plainly fictional characters are so recognizable that a collection of them surely would be classified as Americana at its lighthearted best.

On May 11, 1987, a new escapade, which we shall refer to as the Flipside episode, started in Dick Tracy. In the Flipside episode Jake Staxx is the owner of a record company named Stax O Wax. He intends to testify against organized crime figures that are part of a special investigation centering on payola, *i.e.*, drugs, cars and jewelry given to disc jockeys to play certain records. When detective Dick Tracy (Tracy) learns of the payola investigation, he tells his assistant, detective Sam Catchem, that gangsters have put a new spin on that particular golden oldie. On May 13, 1987, Tracy states: "Flipside, Inc., a so-called independent promotion outfit, is using bribery to get

radio air play for certain records. But the special prosecutor has a key witness who can help us shut down this payola train."

Two of the other characters that are involved in the payola caper are A.M. and F.M. Stereo. They are identical twin brothers who maintain a sartorial uniqueness by always wearing the same collarless dark jackets and large bow ties. Also, the Stereo brothers always conclude each other's thoughts and sentences when they speak.

Jake Staxx is murdered by A.M. and F.M. Stereo shortly before he is scheduled to testify in the payola investigation. The killing is done with the use of an arcane black box about the size of a common book. The black box is plugged into an aux/video.[1] When A.M. and F.M. Stereo turn the black box on, it emits sound waves which have such a high frequency that they cannot be heard. The piercing sound waves, however, obliterate Jake Staxx's inner ear, causing him to have spasmodic convulsions which result in a heart attack and death. A.M. and F.M. Stereo are wearing earplugs and therefore not affected by the sound waves. A death that results from the sound waves appears to be caused by a heart attack rather than foul play.

When Tracy investigates the death of Jake Staxx, he suspects foul play when he notices that the aux/video in Jake Staxx's office is turned on even though there is no T.V. in the room, and there is no tape in the tape deck or record on the turntable. Tracy quizzically states: "Convenient for Jake Staxx to die suddenly, of 'natural causes'—when the city's most powerful organized crime figures want him dead." On May 25, 1987, however, the coroner's office officially declares that Jake Staxx died of a heart attack. When Tracy is asked, "What now?" he states: "We concentrate on Flipside, Inc., the independent promotion outfit that benefitted the most from the murder." As Tracy continues his investigation, as usual, he utilizes his two-way wrist radio-TV computer.

A.M. and F.M. Stereo next attempt to bribe a top-rated radio disc jockey named Themesong. At one time, Themesong was a young female street singer fronting for her pickpocket pop until Tracy straightened her out,[2] and she went to college and majored in broadcast journalism. Later, Themesong became a radio disc jockey. On her top-rated radio show, she has an irreverent sidekick named Garry Doll. Themesong and Garry Doll work out of a private studio for a ra-

---

[1]In a separate comic strip square, it is noted that an aux/video is an auxillary input "for a T.V. or a musical instrument like a keyboard or guitar."

[2]Some of the terms and phraseology used in this opinion are adopted directly from the Flipside episode in order to convey the true nature of the characters and events portrayed in the comic strip.

dio station called WHUB The Hub.

A.M. and F.M. Stereo tell Themesong and Garry Doll that they represent Flipside, Inc., an independent record promotion outfit. A.M. and F.M. Stereo attempt to bribe Themesong and Garry Doll by offering them a new car, jewelry and drugs if they will play certain records on their show. Garry Doll calls A.M. and F.M. "garbage," and he and Themesong refuse the offer. After Themesong and Garry Doll refuse the offer, Themesong decides to meet with Tracy. Tracy tells Themesong that he is investigating Flipside, Inc., and that the names turning up at Flipside, Inc., are apparatus alumni.[3]

Tracy also tells Themesong that he believes Flipside, Inc., is an apparatus operation. Tracy then tells Themesong that the thrust of his investigation of Flipside, Inc., is not payola. He says that he is exploring the sale of counterfeit records and cutouts. Cutouts are records deleted from a label's catalogue and sold cheaply to chain outlets for their sale bins.

On June 10, 1987, Tracy tells Themesong that last month Flipside, Inc., sold $250,000 in cutouts to Stax O Wax, but the president of the company, Jake Staxx, withheld payment. Tracy says that Jake Staxx claimed that the cutouts that were delivered were junk; not older records by major artists as promised, but unsuccessful records by unknowns. Tracy states that in his opinion, Jake Staxx was murdered. He then confirms Themesong's belief that she is up against mob guys, murderers.

Tracy then suggests to Themesong that if the Stereo brothers approach her again, she should pretend to accept their payola offer but she should be wearing one of his two-way wrist radio-TV computers, and he will be listening. Themesong refuses to wear a two-way wrist radio-TV computer, and states that she would prefer to keep her distance from the whole scene and not be involved.

At this point, on June 14, 1987, a character whose name is Flipside is introduced. He is the eponym for Flipside, Inc. Later, on July 27, 1987, we learn that his real name is Victor Promomo. According to him, the name Flipside is a pseudonym and not an alias.

Flipside is a rotund villain with a flat, swirled curl of hair predominating the top of his head and forehead. He has a penchant for speaking in rhymes, for example: "Everybody wants money, honey; Just kill one, son; Split the scene, Gene; Lets give your tape a spin, Lynn; and I'll just flip the switch, Mitch." Also, he invariably is seen

---

[3]As noted with an asterisk in one of the comic strip squares, in Dick Tracy jargon apparatus means crime syndicate.

listening to a juke box playing '50s music such as "Turn Me Loose," and "I Found My Thrill;" he hates modern pop music.

Flipside meets with A.M. and F.M. Stereo, and they tell him that Themesong and Garry Doll have refused payola. When A.M. and F.M. Stereo ask Flipside what they should do, Flipside states: "Just kill one, son." The Stereo brothers then go to the WHUB The Hub studio where Garry Doll is alone and working late. The Stereo brothers plug the black box into an aux/video and turn the black box on, while they are wearing earplugs. Garry Doll has convulsions and dies of a heart attack caused by the silent but piercing sound waves from the black box.

When Tracy investigates Garry Doll's death, he notices that the aux/video is turned on, and other similarities between Garry Doll's death and Jake Staxx's death. Tracy suspects that the aux/video had something to do with the deaths.

Tracy then meets with Dr. Polly Phonic who is in charge of the Acoustical Research and Development Laboratory. Dr. Polly Phonic explains to Tracy that scientists have been working on an aural laser. She tells Tracy that the aural laser has been used to perform incision-less and painless surgery. Dr. Polly Phonic, however, also tells Tracy that the aural laser can be used to kill. She tells Tracy that the aural laser can produce a silent sound that is known as black sound, which can be fatal. Black sound is described as sound exceeding 175 dB's,[4] which will obliterate the inner ear, causing convulsions and death by heart attack.

Meanwhile, Themesong identifies the Stereo brothers from mug shots that she is shown by Sam Catchem. Sam Catchem then contacts Tracy on his two-way wrist radio-TV computer. Sam Catchem and Tracy then go to the Flipside, Inc., office to bust the Stereo brothers. At the Flipside, Inc., office, A.M. and F.M. Stereo put on their ear-plugs, plug the black box into an aux/video, and turn the black box on, towards Tracy and Sam Catchem. The Stereo brothers then flee.

While Tracy and Sam Catchem are going into convulsions, Tracy sees the black box that is emitting the sound waves, and he shoots it, thus stopping the sound waves. Tracy and Sam Catchem therefore are saved, and they now realize how Jake Staxx and Garry Doll were murdered. Tracy then puts out an APB[5] on A.M. and F.M. Stereo.

Flipside next meets with A.R. Mann, the top record producer for

---

[4] As noted with an asterisk in one of the comic strip squares, dB's means decibels.

[5] As noted with an asterisk in one of the comic strip squares, APB means All Points Bulletin.

Flipside, Inc. Later, they meet with and attempt to get Sparkle Plenty involved in a scheme. Sparkle Plenty was a child singing star whose singing career waned and ended when she got older. She is now married to Richard Tracy, Jr., Tracy's son.

Flipside and A.R. Mann encourage Sparkle Plenty to attempt a comeback by making records for Flipside's record company named Edis Pilf. Although it is not known by Sparkle Plenty, Flipside and A.R. Mann want to revive Sparkle Plenty's washed-up career so that they can sell her records by offering payola to disc jockeys. Sparkle Plenty, Flipside and A.R. Mann go to the Edis Pilf recording studio where Sparkle Plenty is to record her old song hits as revivals, including "Two Sons From Tucson" and "Peg O' My Heart."

While they are at the Edis Pilf recording studio, Sparkle Plenty overhears a conversation between Flipside and A.M. and F.M. Stereo. In the conversation, Flipside and A.M. and F.M. Stereo plot to murder Themesong because Themesong can identify A.M. and F.M. Stereo as the murderers of Garry Doll. After she overhears the ominous conversation, Sparkle Plenty surreptitiously makes a phone call to Tracy and tells him what she heard. Tracy sends Sam Catchem to the WHUB The Hub radio studio where Themesong is working on her radio show.

A.M. and F.M. Stereo leave the Edis Pilf recording studio and attempt to carry out the plot to kill Themesong. They enter Themesong's vacant automobile, which is parked at the WHUB The Hub radio studio parking lot, while Themesong is completing her radio show. A.M. and F.M. Stereo hook up a remote unit to the powerful stereo system in the automobile, and they plug in a black box. They remark that the black box is a twin of the black box that was shot and destroyed by Tracy. After plugging in the black box, the Stereo brothers hide on the floor behind the front seat of the automobile. When Themesong enters the automobile, the Stereo brothers grab her and then attempt to kill her by using the black box. They put earplugs in their ears and turn the black box on to start its deadly black sound.

A problem arises, however, when Themesong's automobile is noticed by Sam Catchem as he is driving to the WHUB The Hub radio studio to locate Themesong in accordance with Tracy's instructions. When Sam Catchem sees that there is someone in Themesong's parked automobile, he runs toward the automobile with his gun drawn. When A.M. and F.M. Stereo see Sam Catchem, they flee Themesong's automobile, still wearing their earplugs.

Sam Catchem then chases A.M. and F.M. Stereo across a dark street. Suddenly a large truck comes down the street at full speed.

The driver is blowing his horn and the truck's brakes are screeching. A.M. and F.M. Stereo are running across the street but they cannot hear the horn honking because they are still wearing their earplugs. As a result, they are hit by the truck and killed. Sam Catchem remarks that they are "flattened flatter than a 45 record."

Meanwhile, Tracy appears at the Edis Pilf recording studio where Sparkle Plenty is finishing her recording of "Two Sons From Tucson." Tracy confronts Flipside in the studio. Flipside grabs Sparkle Plenty and holds her as a hostage. He then knocks Tracy down to the floor by hitting him over the head with a gun. Flipside then ties Tracy and Sparkle Plenty to separate chairs in the recording studio.

Flipside then attempts to kill Tracy and Sparkle Plenty by plugging a black box into an aux/video and turning the black box on to start its deadly black sound. He also turns the sound system on in the recording studio and plays Sparkle Plenty's recording of "Two Sons From Tucson." Flipside then leaves the recording studio while the deadly sound waves are emitting from the black box, and the sound system in the recording studio is loudly playing "Two Sons From Tucson." As he is leaving, Flipside tells Tracy: "In a few minutes I'll check back, Mack—and see how you dug it."

Although Tracy and Sparkle Plenty start having convulsions, the high frequency sound waves that are coming from the black box shatter the glass window of a booth in the recording studio. When the glass window is shattered, Tracy uses a piece of broken glass to cut the rope that is binding him, and he frees himself. He then frees Sparkle Plenty.

As Tracy and Sparkle Plenty are leaving the recording studio, they are confronted by Flipside, who is returning to the recording studio. Flipside draws a gun. Sam Catchem suddenly arrives from behind Flipside and holds Flipside at gun point. Flipside, however, knocks Sam Catchem down and flees. Tracy chases Flipside into a record pressing plant and warehouse that adjoins the Edis Pilf recording studio.

Tracy throws a record, as if it were a Frisbee, toward the fleeing Flipside. The record hits Flipside behind the knees as he is running, causing him to stumble forward, and his head falls horizontally between the presses of a record pressing machine. As Flipside's head falls horizontally between the presses, he inadvertently knocks the start button on the machine. The machine starts, and Flipside's head is smashed flat like a record. Sam Catchem comes running into the area and sees what has happened. He states: "Ye Gods—do we send for a body bag, or a record sleeve?" Tracy declares that Flipside is

rendered "permanently off the charts."

■■ The complaint contains as an exhibit reproductions of the Flipside episode from May 13, 1987, through June 25, 1987. In support of their motion to dismiss, defendants filed as an exhibit reproductions of the Flipside episode from May 13, 1987, through October 12, 1987, which constitutes the entire Flipside episode. In addition, the plaintiffs filed two affidavits which were stricken by the trial court. Plaintiffs do not present any argument on appeal that it was error to strike the affidavits. As a result, the issue as to the affidavits has been waived and no consideration will be given to the affidavits. *Stach v. Sears, Roebuck & Co.* (1981), 102 Ill. App. 3d 397, 404, 429 N.E.2d 1242, 1247-48; *People ex rel. Daley v. Warren Motors, Inc.* (1985), 136 Ill. App. 3d 505, 516, 483 N.E.2d 427, 434; 107 Ill. 2d R. 341(e)(7).

We first address plaintiffs' contention that to determine whether the complaint states a cause of action we should only consider the Flipside episode from May 13, 1987, up to but not including June 14, 1987. The reason for plaintiffs' contention is that the Flipside character was not introduced in the episode until June 14, 1987. Prior to June 14, 1987, the episode focused on A.M. and F.M. Stereo and Flipside, Inc. In their reply brief, the plaintiffs state: "The defendants' references were not at all comic until after June 14, 1987."

Plaintiffs' contention is without merit for several reasons. First, the complaint itself makes allegations that refer to incidents in the Flipside episode that occurred after June 14, 1987. Paragraph 21 of the complaint alleges that on June 15, "the brothers were shown discussing a possible murder." Paragraph 22 of the complaint alleges that from June 21 through June 25, "plaintiffs were depicted as committing the murder of Garry Doll." In addition, paragraph 5 of the complaint refers to matters that occurred "[o]n or between May 13, 1987 and the present date," and paragraph 24 alleges that from "May of 1987 to the present, the publications depicted plaintiffs as Mafia members who committed murder, engaged in bribery, fraud and other crimes of moral turpitude." The complaint was filed on October 14, 1987, which means that paragraphs 5 and 24 refer to whatever matters that occurred in the Flipside episode from May 1987 to at least October 14, 1987. Moreover, paragraph 33 of the complaint states: "True and correct copies of several of the pertinent strips are attached hereto as Exhibit A." Exhibit A includes a reproduction of Dick Tracy from May 13 through June 25, 1987. An exhibit to a complaint constitutes a part of the complaint for all purposes. Ill. Rev. Stat. 1989, ch. 110, par. 2—606.

Thus, as can readily be seen from plaintiffs' complaint and exhibit A, plaintiffs' contention is without merit based upon allegations made in their own pleading. The plaintiffs cannot allege in their complaint as part of their cause of action should their case go to trial facts which occurred after June 14, 1987, and then argue on appeal that the court should not consider those same alleged facts to determine whether the complaint alleges a cause of action. We cannot allow the defendants or the court to be whipsawed by allowing the plaintiffs to take such alternative positions.

■ There is, however, another reason that plaintiffs' contention fails. A statement cannot be meaningfully assessed for any reason without knowing the context of the statement. If a defamation action is alleged on the basis of what appears in an artistic square of an episodic comic strip, the entire episode and not just the isolated artistic square provides the context for determining the existence or nonexistence of an actionable libel. (See *Grisanzio v. Rockford Newspapers, Inc.* (1985), 132 Ill. App. 3d 914, 919-20, 477 N.E.2d 805, 809; *Dworkin v. Hustler Magazine, Inc.* (C.D. Cal. 1987), 668 F. Supp. 1408, 1416.) This conclusion is surely consistent with the maxim that one cannot select isolated sentences or statements out of an article or book in an attempt to create a claim for libel. The whole article or book, just as the entire episode in an episodic comic strip, must be viewed in order to determine the context of any statement that is made.

■■ Moreover, we must not lose sight of the fact that the issue in the trial court and here is one of law. The complaint must be examined in the first instance on the basis of whether as a matter of law the statements complained of within the Flipside episode are sufficient to state an action for defamation. (*Chapski v. Copley Press* (1982), 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199.) In order to make that kind of an assessment, the court must view the statements in their full context, which means viewing the entire episode. Surely, if this case were to be tried, the entire Flipside episode would be relevant and admissible. It follows that the court should consider the entire Flipside episode to determine whether as a matter of law the complained-of statements are sufficient to state an action for defamation. We therefore conclude that plaintiffs' contention that we should only consider the Flipside episode from May 13, 1987, up to but not including June 14, 1987, to determine whether the complaint states a cause of action for defamation is not tenable.

Aside from what we have already mentioned, the chronology of charges for all three counts is alleged as follows in the complaint:

"5. On or between May 13, 1987 and the present date, the Chicago Tribune newspaper published a number of daily pictorial and captioned newspaper comics as part of a new Dick Tracy cartoon series.

6. The new series referred to a well known record company that was the subject of a special prosecutor's investigation.

7. A May 16, 1987, comic strip referred to 'payola,' stating that 'gangsters have put a new spin on that particular golden oldie.'

8. The next comic strip, published on May 17, stated that 'Flipside, Inc., a so called independent promotion outfit, is using bribery to get radio air play for certain records—but the special prosecutor has a key witness who can help us shut down this payola train.'

9. On or about May 19, the cartoon depicted the murder of the record company salesman who was to have been the 'key witness' for the special prosecutor.

10. On May 20, the comic strip ascribed the death to 'the city's most powerful organized crime figures,' and implied that the death was caused by Flip Side, Inc. and its principals.

11. On May 29, the strip introduced a new character to the story, Garry Doll. Garry Doll was intended to represent Chicago disc jockey Steve Dahl. Steve Dahl's broadcasting partner is Garry Meier.[6]

12. In the next strip, dated May 30, Dick Tracy determined to continue to investigate the death of the record salesman and to 'concentrate on Flipside, Inc., the independent promotion outfit that benefitted most from the murder.'

13. On May 31 and June 1, the strip introduced two brothers who represented Flipside, Inc., intimating that they were offering payola to Garry Doll.

14. On June 5, the strip depicted the brothers offering drugs as part of their bribery scheme.

15. On June 6, the brothers were referred to as 'garbage.'

16. On June 7, Dick Tracy stated that 'we're investigating Flipside, Inc...the names turning up at Flipside, Inc. are apparatus* alumni.' The strip defines 'apparatus' as the 'crime syndicate.'

17. On June 8, the strip reiterated that 'apparatus' means

---

[6]No mention of Garry Meier is made in plaintiffs' brief or reply brief except for the notation that "Dahl's real-life radio partner is Garry Meier."

'crime syndicate,' and Dick Tracy stated that 'we believe Flipside, Inc. is an apparatus operation.'

18. On June 9-10, the plaintiffs were depicted as engaging in a fraudulent scheme involving the sale of records.

19. On June 12, the brothers were depicted as 'mob guys' and 'murderers.'

20. On June 14, the brothers were shown in a cartoon with the statement 'Tracy says Flipside, Inc. is run by mob guys.'

21. On June 15, the brothers were shown discussing a possible murder.

22. On June 21-25, plaintiffs were depicted as committing the murder of Garry Doll.[7]

23. Several statements in the series implied that the story took place in Chicago.[8]

24. From May of 1987 to the present, the publications depicted plaintiffs as Mafia[9] members who committed murder, engaged in bribery, fraud and other crimes of moral turpitude.

25. The publications adversely reflected on the Rosenbaum brothers and their company's ability and integrity in the record business.

26. The newspaper's cartoon pictorials affected plaintiffs' professional standing and trade by lowering their reputation and esteem in the eyes of Chicago Tribune readers, readers of other publications across the country that publish defendants' Dick Tracy strip, and those who have heard about the allegations, including persons in the record industry.

27. The contents of the comic strip have been published

---

[7]In paragraph 11 of the complaint, the plaintiffs allege that the murdered Garry Doll was intended to represent Chicago disc jockey Steve Dahl (of radio station WLUP, known as the Loop). Although they do not allege it in their complaint, in their brief plaintiffs state that both the murdered Garry Doll and Steve Dahl "favor wearing Hawaiian print sport shirts." Plaintiffs acknowledge, however, that Steve Dahl is living, and there is no intimation by the plaintiffs that he was ever involved as the subject of a murder scheme. Plaintiffs' strained effort to show a relationship between Garry Doll and Steve Dahl is neither persuasive nor significant to demonstrate that the comic strip could be reasonably understood by persons of ordinary intelligence as describing actual facts about the plaintiffs.

[8]There are no factual allegations in the complaint to support the bare conclusion that several statements in the series implied that the story took place in Chicago. The plaintiffs state in their reply brief without specific reference that "these initial strips refer to the Chicago suburb of Homewood." We find no reference whatsoever to the Chicago suburb of Homewood, Illinois in the Flipside episode.

[9]The word Mafia is not found anywhere in the Flipside episode.

to millions of comic strip readers on a daily basis.

28. The comic strip's pictorial displays, statements and captions were untrue.

29. These publications were knowingly, recklessly, and maliciously published with full knowledge and belief that the substance of the publications were untrue.

30. Such publication constituted libel per se.

31. Consequently, plaintiffs seek compensatory and special damages for their pecuniary loss, injury to their reputation, and for their pain and mental suffering."

■■ ■ A communication is considered defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him. The communication, however, must be reasonably understood to be a false communication of fact about the plaintiff. In other words, the communication must be a false representation of fact of and concerning the plaintiff. (See *Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 57, 99 L. Ed. 2d 41, 53, 108 S. Ct. 876, 882-83; *Chapski v. Copley Press, Inc.* (1982), 92 Ill. 2d 344, 352, 442 N.E.2d 195, 199.) Only statements that are capable of being proved false are subject to liability under the law of libel. See *Milkovich v. Lorain Journal Co.* (1990), 497 U.S. ____, ____, 111 L. Ed. 2d 1, 19, 110 S. Ct. 2695, 2708 (Brennan, J., dissenting).

■■ Thus, a basic requirement of a defamation case based upon an episodic comic strip is that the story must be reasonably understood as describing actual facts about the plaintiff. The reasonably understood and the actual facts elements are required because first amendment freedoms need breathing space to survive, and as protection against encroachment upon rights protected by the first amendment. (See *National Association for the Advancement of Colored People v. Button* (1962), 371 U.S. 415, 433, 9 L. Ed. 2d 405, 418, 83 S. Ct. 328, 338; *Pring v. Penthouse International, Ltd.* (10th Cir. 1983), 695 F.2d 438, 440.) The crucible to be applied is whether the comic strip within the context presented could be reasonably understood by persons of ordinary intelligence as describing actual facts about the plaintiff or actual events in which the plaintiff participated.

Here, it is readily apparent that the Flipside episode is all fanciful adventure and does not purport to be factual. It is simply impossible to believe that a reader would not have understood that the episode is pure fiction and nothing else. In the Flipside episode, the weird characters, villainous bravado and hyperbole, rhetorical rhymes, crime syndicate, mob figures, mysterious deaths, murders, criminal schemes,

and character names that relate to the physical or personality attributes of the characters are all classic Dick Tracy. No reader would reasonably conclude that these references to characters, businesses, places and events are factual.

This is especially true when we bear in mind that Dick Tracy appears in the Chicago Tribune only on pages where there appear nothing but comic strips, where levity exists and not reality. This is not to say that comic strips, regardless of where they appear in a newspaper, cannot or never convey serious, real and thought-provoking messages. Here, however, the fact that the Flipside episode only appeared as a comic strip on pages in the newspaper devoted solely to comic strips strongly fortifies the conclusion that the characters, businesses, places and events in the Flipside episode have no more reality than those in the Pruneface or Flattop episodes of Dick Tracy.

■ Under the circumstances, the only conclusion that can be reached is that the Flipside episode cannot be reasonably understood by persons of ordinary intelligence as describing actual facts about the plaintiffs or actual events in which the plaintiffs participated. It follows that there is no defamation as a matter of law.

To support its claim, plaintiff Flip Side, Inc., strenuously emphasizes the fact that there is a similarity of names and businesses between it and Flipside, Inc., in the comic strip. The breathing space that is required for first amendment freedoms, however, will not allow a defamation action to be maintained merely because there is a similarity of names and businesses between the plaintiff and the subject in the publication. A similarity of names and businesses will not cause an alleged defamation action to pass constitutional muster unless the subject in the publication is reasonably understood as describing actual facts about the plaintiff. Moreover, this principle applies even if the names and businesses are identical because no cause of action can ever be maintained at the expense of first amendment freedoms and protections. Here, since the Flipside episode is not reasonably understood as describing actual facts about plaintiff Flip Side, Inc., there is no merit to the argument of plaintiff Flip Side, Inc. *Cf. Hustler Magazine v. Falwell* (1988), 485 U.S. 46, 57, 99 L. Ed. 2d 41, 53, 108 S. Ct. 876, 882-83; *Pring v. Penthouse International, Ltd.* (10th Cir. 1983), 695 F.2d 438, 443.

As to plaintiffs Carl and Lawrence Rosenbaum, there is no allegation that any character in the Flipside episode has a similar sounding name, and there is no descriptive factual allegation showing that either Carl or Lawrence Rosenbaum physically resembles any character in the episode. The brothers in the Flipside episode are twins. They

are readily identifiable because they have a sartorial uniqueness in that they always wear dark collarless jackets and large bow ties, and they conclude each other's thoughts and sentences when they speak. There is no allegation in the complaint ascribing any of these identifiable features to plaintiffs Carl or Lawrence Rosenbaum. It follows that for the reasons we have discussed with respect to plaintiff Flip Side, Inc., the Flipside episode is not reasonably understood as describing actual facts about plaintiffs Carl and Lawrence Rosenbaum.

Since the Flipside episode cannot reasonably be understood as describing actual facts about any of the plaintiffs, count I of the complaint does not allege an action for libel as a matter of law. (See *Yorty v. Chandler* (1971), 13 Cal. App. 3d 467, 475, 91 Cal. Rptr. 709, 714; *Harris v. School Annual Publishing Co.* (Ala. 1985), 466 So. 2d 963, 964.) The trial court therefore did not err in dismissing count I of the complaint.

Since counts II and III of the complaint are based upon the same publication alleged in count I, it would serve no useful purpose to treat counts II and III separately, as the same requirements that the publication must be reasonably understood as describing actual facts about the plaintiffs and the same first amendment considerations must be applied. See *Hustler Magazine v. Falwell*, 485 U.S. at 57, 99 L. Ed. 2d at 53, 108 S. Ct. at 882-83; *Pring v. Penthouse International, Ltd.* (10th Cir. 1983), 695 F.2d 438, 442.

██ █ We bear in mind that we must accept as true all well-pled facts alleged in the complaint and all reasonable inferences which can be drawn therefrom. Conclusions of law or conclusions of fact not supported by allegations of specific facts, however, are not considered. (*Schaffer v. Zekman* (1990), 196 Ill. App. 3d 727, 731, 554 N.E.2d 988, 991.) Also, we bear in mind that whether the publication in an alleged libel action is capable of defamatory meaning is a question, in the first instance, for the court. (*Chapski v. Copley Press*, 92 Ill. 2d at 352, 442 N.E.2d at 199.) If the publication is not capable of defamatory meaning in the first instance, the court is required to rule that the publication is not a defamation as a matter of law and the suit should be dismissed. This is not merely an aphorism or Illinois law, it is part of the first amendment guarantee of free speech which we all enjoy as Americans. See *Greenbelt Co-op Publishing Association v. Bresler* (1970), 398 U.S. 6, 26 L. Ed. 2d 6, 90 S. Ct. 1537; *New York Times Co. v. Sullivan* (1964), 376 U.S. 254, 292, 11 L. Ed. 2d 686, 714, 84 S. Ct. 710, 732.

██ Accordingly, we conclude that since the publication that is involved here cannot be reasonably understood as describing actual

facts about the plaintiffs, it is not a defamation as a matter of law. We also conclude that for the reasons we have stated, all three counts in the complaint should be dismissed. The order of the trial court dismissing the suit is affirmed.

Affirmed.

CERDA, P.J., and WHITE, J., concur.